Kevin M. Cuddy (Bar No. 0810062)
Connor R. Smith (Bar No. 1905046)
STOEL RIVES LLP
510 L Street, Suite 500
Anchorage, AK 99501
Telephone: 907.277.1900
Facsimile: 907.277.1920
kevin.cuddy@stoel.com
connor.smith@stoel.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CONOCOPHILLIPS ALASKA, INC., | |
| Plaintiff, | |
| v. | |
| ALASKA OIL AND GAS CONSERVATION COMMISSION, | |
| Defendant. | Case No.: 3:22-cv-00121-SLG |

## **MOTION FOR PARTIAL SUMMARY JUDGMENT**

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG

**STOEL RIVES** LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................ 1

II.     STATEMENT OF UNDISPUTED FACTS.......................................... 1

        A.     The History of Private Leasing in the NPR-A ........................ 1

        B.     The Oil and Gas Information Program....................................... 12

        C.     CPAI's Federal Leases and Well Data....................................... 13

        D.     Contrary to Federal Law, AOGCC Says It Will Publicly Disclose CPAI's Well Data.................................................. 16

III.    LEGAL STANDARD .................................................................... 17

IV.     ARGUMENT ................................................................................ 17

        A.     AOGCC's Public Disclosure of Well Data Impermissibly Conflicts with Federal Law and Stands as an Obstacle to Congress's Objectives ................................................................ 18

               1.     The State Disclosure Laws obstruct and impermissibly interfere with Congress's goal of incentivizing exploration .......... 19

               2.     The State Disclosure Laws disrupt the careful balance struck by Congress through the Oil and Gas Information Program ......... 22

               3.     The State cannot interfere with the federal government's ability to contract.............................................. 25

        B.     The Confidential Information Statute Expressly Preempts the State's Public Disclosure of CPAI's Well Data....................... 27

               1.     The statutory framework and text of the NPRPA confirm that the express preemption provision applies to the State Disclosure Laws as applied by AOGCC....................... 28

               2.     Congress's purpose further confirms that the State Disclosure Laws are expressly preempted ....................... 34

V.      CONCLUSION ............................................................................. 38

Case 3:22-cv-00121-SLG   Document 12   Filed 07/29/22   Page 2 of 41

# I. INTRODUCTION

Defendant ("AOGCC") is improperly using State law to require premature public disclosure of confidential well data ("Well Data") that was obtained from federal leases on federal land in the National Petroleum Reserve in Alaska ("NPR-A"). To incentivize private exploration and development of the NPR-A, Congress enacted a federal law that protects the confidentiality of this data. AOGCC's use of State law conflicts with this federal law by undermining Congress's confidentiality protections and removing a key incentive for private explorers like plaintiff ("CPAI") to explore and develop these federal lands for oil and gas. Any such state laws are preempted when, as applied, they stand as an obstacle to the accomplishment of Congress's objectives and expressly conflict with federal law. This court should rule as a matter of law that Congress's confidentiality protections for this data implicitly and explicitly preempt AOGCC's improper application of State law that would otherwise require early public disclosure of that data.[1]

# II. STATEMENT OF UNDISPUTED FACTS

## A. The History of Private Leasing in the NPR-A

The NPR-A was established as the Naval Petroleum Reserve No. 4 by President Harding in 1923.[2] Consisting of 23.6 million acres on Alaska's North Slope, the reserve

---

[1] CPAI is simultaneously opposing AOGCC's motion to dismiss. While there is inevitably overlap between the briefs, this brief establishes CPAI's entitlement to summary judgment as to its request for declaratory relief.

[2] *See Sovereign Inupiat for a Living Arctic v. BLM*, 516 F. Supp. 3d 943, 946 (D. Alaska 2021), *appeal dismissed*, No. 21-35085, 2021 WL 3371588 (9th Cir. Mar. 9, 2021).

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                1

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

is the nation's largest single unit of public land.[3]  Its purpose was to provide an emergency

oil supply to the Navy for national defense, but little exploration was conducted at the

time.[4]  Two events spurred interest in the exploration and development of the reserve.  In

1968, oil and gas was discovered in Prudhoe Bay, and in 1973–74, OPEC imposed an oil

embargo against the United States.[5]  The "oil embargo during the 1970s established that

the Nation had a need for oil that exceeded the needs of the Navy."[6]  Congress promptly

authorized the United States Geological Survey ("USGS") to begin a program of

exploratory drilling in the reserve in 1974.[7]

In 1976, Congress passed the Naval Petroleum Reserves Production Act

("NPRPA"), which transferred jurisdiction of the reserve to the Secretary of the Interior

("Secretary").[8]  The reserve's purpose "was redirected to augment domestic supplies of

crude oil,"[9] and the NPRPA authorized the Secretary to consider "development" that would

be "regulated in a manner consistent with the total energy needs of the Nation."[10]  Section

510 L. Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*
**STOEL RIVES** LLP

---

[3] *See id.*

[4] *See* Report to Congress: Capability of the Naval Petroleum and Oil Shale Reserves to Meet Emergency Oil Needs (1972), at 1, 17, https://www.gao.gov/assets/b-66927.pdf.

[5] *See* George Gryc, The National Petroleum Reserve in Alaska, Earth-Science Considerations, U.S. Geological Survey Professional Paper 1240-C, at C14–C15 (1985), https://pubs.usgs.gov/pp/1240c/report.pdf.

[6] *N. Alaska Env't Ctr. v. Norton*, 361 F. Supp. 2d 1069, 1072 (D. Alaska 2005), *aff'd sub nom. N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006).

[7] *See* Gryc, *supra* note 5, at C15.

[8] Pub. L. No. 94-258, 90 Stat. 303 (1976).

[9] Gryc, *supra* note 5, at C15.

[10] Pub. L. No. 94-258.

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                        2

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

105(b) of the NPRPA directed agencies (in consultation with the State) to study the best procedures to be used in the development, production, transportation, and distribution of petroleum resources in the reserve.[11] The resulting report (the "105(b) Report") addressed exploration and development in the NPR-A, and it was completed in 1979.[12]

The 105(b) Report considered several potential approaches to exploration and development of the NPR-A.[13] Under a "private model," the 105(b) Report noted that the government's role "would be similar to its role in managing oil and gas operations on the OCS [Outer Continental Shelf]" insofar as the government would establish leasing terms and conditions and enforce the relevant regulations.[14] Importantly, the 105(b) Report identified "information externalities" as one of the chief problems potentially impacting any such private exploration model:

> Information externalities occur primarily when a firm explores a tract and the results become known in the industry. This information spillover is of particular value to competitors holding leases on nearby tracts or nearby areas. For example, an oil discovery might yield geologic information that would enable a firm holding leases on adjoining tracts or in adjoining areas to plan more efficient, lower cost exploration programs and would, therefore,

---

[11] *See* Pub. L. 94-258, § 105(b) (codified at 42 U.S.C. § 6505(b)).

[12] Pub. L. No. 94-258, § 104; H.R. Conf. Rep. 94-942, 21, 1976 U.S.C.C.A.N. 516, 523 ("SEC. 104 makes it absolutely clear that only exploration is authorized at the National Petroleum Reserve in Alaska. After the studies are completed and transmitted to the Congress, as required by the legislation, then the Congress will determine how future development and production will take place."); *see* Final Report of the 105(b) Economic and Policy Analysis (cited hereafter as the "105(b) Report"), relevant excerpts included at Dkt. 11-1, (downloadable PDF copy here: https://tinyurl.com/yc3yce4r (last visited July 22, 2022)).

[13] *See* 105(b) Report at 8.

[14] *Id.*

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                3

raise the value of their leases. Often oil companies will trade such information, but there may be cases when the information could give an exploring firm an advantage in future lease sales on nearby tracts, and may be be [sic] withheld.

. . . .

One approach to deal with this issue in NPRA might be a regulation for early public release of information. ***However, a requirement to release exploration information does not compensate the exploring firm for the value of information and could have serious disincentive effects.***[15]

It was understood that any "early public release" of private entities' data would disincentivize them from conducting exploration work in the first instance, since their competitors would unfairly benefit from the explorers' massive efforts.

The 105(b) Report included a special section on "Other Powers of the Secretary" in recognition of the Secretary's special responsibilities and authority for regulating any leasing program in the NPR-A, making note of how "Information" should be handled:

The leasing systems and lease terms should be designed to foster efficient exploration, development and production of NPRA resources. To this end, it is important to have a timely flow of information on oil and gas activity to the Government and, ***with appropriate protective measures***, to the public. This will assist: (1) understanding the geology and planning of exploration, (2) evaluating the potential of tracts to be leased, and (3) impact planning by State and local governments.

***To maintain some competitive edge for at least the next lease sale to companies involved in exploration, release of such data should take place up to 1 year from the date acreage is relinquished to the Government, and up to 10 years from the lease sale date for acreage that is returned by the lessee for exploration and/or production.***[16]

---

[15] *Id.* at 38 (emphasis added).
[16] *Id.* at 57 (emphases added).

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                    4

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

The 105(b) Report thus emphasized that private explorers in the NPR-A were entitled to a "competitive edge" for undertaking the massive effort to collect this data and that the data should not be released publicly until after the leases expired. Others' access to the data was only permissible "with appropriate protective measures" that would allow for "impact planning by State and local governments"—i.e., for the State and local government's internal planning purposes. The Department of Energy similarly proposed that lessees give exploration data to the federal government during the leases' duration and "[d]ata on lands returned to the government [i.e., after the lease expired] are to be released to the public[.]"[17] The State of Alaska ("State") concurred with these positions on lease terms.[18]

The 105(b) Report's discussion of private-versus-government exploration was contextualized by the federal government's own modest exploration efforts in the NPR-A. Through its contractor ("Husky"), the government had drilled just 24 wells in the massive NPR-A (or roughly one well per 1,000 square miles) and had spent nearly three quarters of a billion dollars on the exploration.[19] Husky failed to find any significant deposits, but did perform an initial round of seismic surveys over a significant portion of NPR-A that

---

[17] *Id.* at 135.

[18] *See id.* at 143 (noting that, aside from exceptions not relevant here, "the State concurs in the Departmental position on lease terms"). Congress explicitly cited to, and relied upon, the 105(b) Report's findings when drafting the statute, thereby confirming its relevance as part of this legislative history. *See* 42 U.S.C. § 6506a(n)(2).

[19] *See* 126 Cong. Rec. 20,533-34, 20,537-38 (1980) (downloadable PDF copy here: https://www.congress.gov/bound-congressional-record/1980/07/30/house-section?p=0 (last visited July 22, 2022)); *Husky Oil N.P.R. Operations, Inc. v. Sea Airmotive, Inc.*, 724 P.2d 531, 532 (Alaska 1986).

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                5

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

would facilitate further private exploration.[20]  The 105(b) Report described the NPR-A as being "in an unexplored and undeveloped state" and noted that prompt action was required if NPR-A was to provide any near-term relief in the event of an oil crisis.[21]

On the heels of the 105(b) Report, President Carter called for a private oil and gas leasing program in the NPR-A.[22]  Congress promptly held hearings, obtaining testimony from industry leaders about how best to open NPR-A to private exploration and development.  One industry witness explained that, after studying the results of Husky's data collection, industry members would likely need to reprocess the data and reinterpret the results.[23]  While Husky's data was helpful, it was generally inferior to the type of data obtained by industry experts.[24]  As another industry expert testified, "the collection of geophysical data is competitive, as [is] any aspect in exploring for oil.  Each of us companies feel that we have an edge in some way or another in terms of collecting

[20] 126 Cong. Rec. 20,538 (1980); Department of the Interior and Related Agencies Appropriations for 1981: Part 7 Testimony of Public Witnesses: Hearings Before a Subcomm. of the Comm. on Appropriations ("Hearing Testimony"), at 744 (relevant excerpts included at Dkt. 11-2, downloadable PDF copy here: https://tinyurl.com/mk3yy76j (last visited July 22, 2022)).
[21] 105(b) Report at 15.
[22] President Jimmy Carter, National Petroleum Reserve in Alaska Statement on Proposed Legislation (Jan. 28, 1980). https://www.presidency.ucsb.edu/documents/national-petroleum-reserve-alaska-statement-proposed-legislation (last visited July 5, 2022) ("It is my belief that exploration and development of these resources [in NPR-A] can be achieved most quickly and at least cost to the Government by a federally managed private leasing program.").
[23] Hearing Testimony at 775 (testimony of Tom Wilkinson, ARCO).
[24] See id.

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                6

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

geophysical data."[25]  If industry members promptly upgraded Husky's existing seismic

data during the 1980–81 winter season, this "would allow for detail follow-up **on a**

**proprietary basis** during the 1981–82 season and ultimately would allow for the members

of industry to have established their individual competitive positions prior to a late 1982

lease sale."[26]  In other words, before private industry members could even decide whether

to bid on a lease, they would need to spend up to two years gathering *proprietary* data that

would inform their competitive positions.  Each crew conducting seismic testing was

expected to cost several million dollars.[27]  The benefit to the nation would be that, instead

of Husky's single exploration strategy, numerous industry participants could pursue

different proprietary exploration strategies in a competitive effort to locate and produce as

much oil and gas as possible—at industry's expense, rather than the public's.[28]

Even with an accelerated competitive leasing schedule, however, there was broad

recognition that actual production of oil and gas would take up to a decade or more.  The

105(b) Report noted that exploration alone could take up to seven years, with another seven

years for development.[29]  While exploratory drilling was possible within a couple of years

---

[25] *Id.* at 799 (testimony of W.E. Crain, Alaska Division Exploration Manager for Chevron
U.S.A.).
[26] *Id.* at 776 (testimony of Tom Wilkinson) (emphasis added).
[27] *Id.* at 800 (testimony of W.E. Crain).
[28] *Id.* at 783 (testimony of Tom Wilkinson).
[29] 105(b) Report at 14.

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG          7

after a lease was issued,[30] initial production was not expected until many years later.[31]  To that end, the 105(b) Report recommended 10-year leases, and noted that extensions may be appropriate if oil or gas was being produced, because shorter lease terms could disincentivize prospective lessees from acquiring leases.[32]

On December 12, 1980, Congress added a rider to the Department of Interior appropriations bill that authorized an "expeditious program of competitive [private] leasing of oil and gas in the" NPR-A, thereby amending the NPRPA.[33]  This new law established, consistent with industry leaders' testimony, that the first lease sale would be conducted within 20 months of the law's passage—i.e., after industry members reviewed Husky's government data and performed their own proprietary follow-up data collection.[34]  It also authorized the Secretary to issue leases for an initial period of up to 10 years (with

**STOEL RIVES** LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

---

[30] *Id.* at 139 (noting ARCO's belief that exploratory drilling could be initiated two years after issuance of a lease).

[31] Hearing Testimony at 794 (statement of W.E. Crain) ("In a remote area such as NPRA, an 8 to 10 year time lag between discovery and production must be expected."); *Id.* at 821 (statement of C.J. Lewis on behalf of Sohio Petroleum Company) (noting "it would be very unlikely to anticipate much production before 1990 if a discovery is made immediately after the first lease sale" (emphasis omitted)); 105(b) Report at 138 (referencing Exxon's belief that initial production in eight years was possible).

[32] 105(b) Report at 14, 53, 142–43.

[33] Pub. L. No. 96-514, 94 Stat. 2964 (1980) (codified at 42 U.S.C. § 6506a).

[34] *Compare* 42 U.S.C. § 6506a(d) *with* Hearing Testimony at 794–95 ("We believe industry will have adequate time to prepare for the first sale in the 20 month period following enactment of a Congressional Bill, provided the government promptly makes available all of its presently unreleased geological and geophysical information.  These data are needed immediately so our industry can commence without delay applying its sophisticated processing, technology and interpretive skills.").

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                8

extensions for so long as oil or gas was produced from the lease in paying quantities),[35] which industry leaders explained was the minimum duration necessary for leases to be worthwhile in light of the enormous difficulty of operating in the Arctic and the long anticipated delay between acquiring a lease and actually securing production of oil and gas.[36] The statute also adopted key elements of the Outer Continental Shelf Lands Act ("OCSLA"). First, the NPRPA's bidding systems for lease sales were based on the bidding systems used in the OCSLA.[37] Second, the statute added language that addressed lessees collecting exploration data, providing that data to the federal government, and key confidentiality protections for that data. Specifically, the NPRPA provided that, in connection with this private exploration, "[a]ny information acquired in such explorations shall be subject to the conditions of 43 U.S.C. 1352(a)(1)(A) [OCSLA's "Oil and Gas Information Program".]"[38]

The legislative history of OCSLA's Oil and Gas Information Program—which had been enacted about two years prior to the NPRPA amendment—helps demonstrate why Congress chose to apply it here. Just as with NPR-A, the Department of Interior recognized that the OCS needed to be explored promptly and efficiently in order to expedite oil

---

[35] 42 U.S.C. § 6506a(i).
[36] *See supra* notes 26–27 and accompanying text.
[37] *See* 42 U.S.C. § 6506a(f).
[38] 42 U.S.C. § 6506a(m).

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                    9

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

production in response to the energy crisis.[39]  Just as with NPR-A, the Department of Interior recognized that the federal government was unlikely to be as efficient in exploring the OCS as private industry would.[40]  Just as with NPR-A, the Department of Interior understood that it was important for the federal government to incentivize (or at least not to disincentivize) private explorers to conduct exploration of the OCS by ensuring that any data obtained from this exploration was held confidential.[41]  While the federal and state governments had valid reasons for accessing that information promptly as they managed

---

[39] *See supra* note 21.  In his statement, President Carter recognized that part of stimulating increased domestic oil production required an accelerated leasing schedule in both the OCS and NPR-A.  *See supra* note 22.

[40] *Compare* 105(b) Report at 15 (noting that government exploration operations for NPR-A could be less efficient and effective than a private program) *with Outer Continental Shelf Lands Act Amendments of 1977, Part 1:  Hearings Before the Ad Hoc Select Comm. On Outer Continental Shelf*, 95th Cong. 199 (1977) (cited hereafter as "Ad Hoc Comm. Hearings") (downloadable PDF copy here: https://tinyurl.com/kj8twnk3 (last visited July 22, 2022)) (Secretary of Interior Cecil Andrus) (same for OCS) (Excerpts of the hearing are included at Dkt. 11-3).

[41] *Compare* 105(b) Report at 38 (acknowledging that any early public release of an explorer's data "could have serious disincentive effects" and dissuade private explorers from pursuing leases) *with* Ad Hoc Comm. Hearings at 200 ("The problems of confidentiality or full disclosure of drilling results are central to the value of any exploration program.  Confidentiality . . . is essential if there is to be an incentive for firms to invest their own funds in pre-lease exploration."); *see also* Ad Hoc Comm. Hearings at 223 (John O'Leary, Administrator of Federal Energy Administration) ("Disclosure [to the public] of information which is of a proprietary nature may seriously jeopardize the competitive position of the participants in the OCS program, and may affect their willingness to spend the sums necessary to obtain such information."); *Outer Continental Shelf Lands Act Amendments of 1977: Part 2,  Hearings Before the Ad Hoc Select Comm. on Outer Continental Shelf*, 95th Cong. 1444 (1977) (downloadable PDF copy here: https://tinyurl.com/2by55vwr (last visited July 22, 2022) (statement of A.H. Massad, Mobil Oil Corp.) ("Release of high quality exploration data to the public would largely negate a company's competitive incentive to obtain it.").

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                                    10

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

their respective resources, the general public (and the explorers' competitors in particular) did not.[42] The Oil and Gas Information Program thus imposed stringent confidentiality requirements on this data and imposed significant penalties on anyone who disclosed it improperly—for both OCSLA and NPRPA.

Importantly, the State "heartily endorse[d]" the Oil and Gas Information Program.[43] The State emphasized that acquiring "full information" through the Oil and Gas Information Program was "invaluable" for states because it would help with environmental protection efforts and resource extraction.[44] The State urged Congress to collect "all well data, data from stratigraphic tests, and data from geophysical tests" so that this information could be made available to states.[45] The State went on to propose that "states should receive data under federal regulations *and on a confidential basis* to the same extent as the Secretary . . . . Most states already have laws to maintain confidentiality for this data; those

---

[42] *Compare* 105(b) Report at 38 (noting that public disclosure of an explorer's data to competitors would allow those competitors a "free ride" and would reduce the explorer's competitive advantage in future lease sales) *with* Ad Hoc Comm. Hearings at 202–03 (indicating that the Oil and Gas Information Program would adequately protect the confidentiality of privileged information obtained from exploratory activities under a lease because states would be obliged to maintain the information as privileged and thus the information would only be accessible by "parties with a legitimate need to have such knowledge").

[43] *Outer Continental Shelf Lands Act Amendments of 1977: Hearings Before the Comm. on Energy and Natural Resources*, 95th Cong. 551 (1977) (downloadable PDF copy here: https://tinyurl.com/547x5v4a (last visited July 29, 2022)) (cited hereafter as "Energy Comm. Hearings") (relevant excerpts included at Dkt. 11-4).

[44] *Id.* at 552.

[45] *See id.*

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG          11

that do not would have to first obtain such authority."[46]  The State then recommended that OCSLA be amended to include a provision requiring the Secretary to share data with affected states, subject to regulations promulgated "to assure the confidentiality of privileged information received by the State under this section[.]"[47]  Congress adopted the State's recommendation, in significant part, in 43 U.S.C. § 1352(c).  The State thus understood that the Oil and Gas Information Program—the very same program incorporated into the NPRPA—imposed strict limits on the State's ability to disclose this confidential information.

### B.  The Oil and Gas Information Program.

The Oil and Gas Information Program (as incorporated into the NPRPA) gives the federal government access to a lessee's oil and gas exploration data and further mandates that "[s]uch data and information shall be provided in accordance with regulations which the Secretary shall prescribe." [48]  It specifically directs the Secretary to prescribe regulations to protect the confidentiality of the lessees' and permittees' data.[49]

One of the protections afforded to explorers' data is contained in subsection (g) of the statute, which is entitled "Preemption of State Law by Federal Law."  It provides that "*[a]ny provision of State or local law which provides for public access to any privileged*

---

[46] *Id.* (emphasis added).
[47] *Id.* at 571.
[48] 43 U.S.C. § 1352(a)(1)(A).
[49] *See id.* at § 1352(c).

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                 12

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

*information received or obtained by any person pursuant to this subchapter is expressly preempted by the provisions of this section*, to the extent that it applies to such information."[50]  The lessees' provision of information to the Secretary is subject to the "conditions" that Secretary-prescribed regulations will protect the confidentiality of that information *and* any inconsistent state law will be preempted if it permits public access to the information.

### C. CPAI's Federal Leases and Well Data.

After Congress opened the NPR-A to private exploration and development, CPAI acquired and developed significant lease holdings in the NPR-A.[51]  CPAI's leases were issued pursuant to the Bureau of Land Management's ("BLM") authority under several federal statutes, including the NPRPA, as amended.[52]  Section 5 of the federal leases addresses CPAI's exploration data, consistent with NPRPA.  It provides that this data shall be furnished to the federal government in the normal course, and it includes a corresponding promise that information obtained under the lease will be held confidential for the duration of the lease.[53]

---

[50] *Id.* at § 1352(g) (emphasis added).
[51] *See Sovereign Inupiat*, 516 F. Supp. 3d at 946.
[52] *See* Decl. of John F. Schell, Jr. ("Schell Decl."), filed contemporaneously herewith, at Ex. 1, Federal Leases, at 2.
[53] *Id.* at 3, 7.

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                    13

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

Since roughly 2017, CPAI has invested tens of millions of dollars exploring the NPR-A.[54] Under its federal leases, CPAI has drilled wells Stony Hill 1, Tinmiq 7–9, and West Willow 1 (the "Wells") in the NPR-A and collected highly valuable Well Data from these efforts.[55] CPAI has understood that its Well Data was and is subject to confidential treatment under federal law and the terms of the federal leases.[56] The Well Data provides CPAI with a significant competitive advantage in exploring and developing the NPR-A.[57] In addition to the significant value this Well Data has for CPAI's own exploratory work, the Well Data also has considerable trade value with other operators wishing to pursue exploration in the region.[58] This data has enormous value to CPAI's competitors that may have an interest in drilling their own wells in the NPR-A.[59] The value of the Well Data to CPAI would be lost if this data was publicly disclosed because CPAI would lose its competitive advantage as to others that competitively bid in lease sales in the area.[60]

When CPAI enters into leases knowing that the resulting Well Data will be disclosed to the public promptly, that knowledge is factored into CPAI's valuation of the lease and/or the decision to explore.[61] Although CPAI would prefer that the Well Data it obtains from

---

[54] Schell Decl., ¶ 3.
[55] *Id.*
[56] *Id.* at ¶ 6.
[57] *Id.* at ¶ 4.
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *Id.* at ¶ 5.

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG            14

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

its exploration and drilling activities remain confidential indefinitely, its decisions to invest in leases and ultimately to drill exploration wells assume the acquired Well Data will remain confidential from the public as provided by law (in this case, federal law) and the terms of the leases.[62]  Accordingly, CPAI makes sizable exploratory investments in reliance on assurances of confidentiality like those contained in the NPRPA and the federal leases.[63]

If AOGCC were to disclose CPAI's confidential Well Data prior to the time set by federal law, it would serve as a disincentive for CPAI to drill further wells in the NPR-A.[64] CPAI's competitors would undoubtedly take advantage of CPAI's enormous investments in acquiring this data, allowing them to benefit from CPAI's efforts for free.[65]  This in turn would inevitably create a scenario in which oil and gas exploration companies would seek to "wait out" their competitors in the hopes that some other company would conduct explorations that could then be exploited.[66]  Because explorers would be incentivized to wait for others to do the hard and expensive work of collecting this highly valuable data, there would be less exploration of NPR-A.[67]

---

[62] *Id.*

[63] *Id.*

[64] *Id.* at ¶ 6.

[65] *Id.*

[66] *Id.*

[67] *Id.*

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                   15

## D. Contrary to Federal Law, AOGCC Says It Will Publicly Disclose CPAI's Well Data.

In order to allow the federal and state regulatory systems to work harmoniously, CPAI consented to the delivery of its Well Data to AOGCC, but this consent included express conditions that were conveyed in writing on the transmittal paperwork.[68] This included notifying AOGCC that the "Confidential Data . . . is from a well located on federal land (Federal Well Data)," and requiring AOGCC's signed acknowledgment of receipt that "[t]his Federal Well Data is exploration well data that must be held confidential under AS 31.05.035(c) and 20 AAC 25.537(d) [and that] also must be held confidential indefinitely (i.e., beyond two years) under 5 U.S.C. 552(b)(4) and (9)."[69] The Well Data CPAI provided to AOGCC was a subset of the same Well Data CPAI provided to BLM pursuant to the federal leases and federal law.[70] The data has significant financial value that will be extinguished if it is made public by AOGCC.[71] CPAI reasonably expected AOGCC to keep the Well Data confidential.[72]

Alaska Statute 31.05.035(c) and the corresponding regulation (20 AAC 25.537(d), collectively the "State Disclosure Laws") direct AOGCC to hold confidential oil and gas well information filed with it for 24 months following the 30-day period after completion

---

[68] *Id.* at ¶ 7; *id.* Exh. 2.
[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.*

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                16

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

of the well. To date, CPAI's Well Data has been held confidential by AOGCC, but the 24-month period has run for each of the Wells. While CPAI had hoped to avoid the need for this lawsuit by seeking to preserve the confidentiality through various efforts, the State has indicated that it intends to disclose the data unless CPAI obtains a judicial ruling to the contrary. Accordingly, CPAI brought this suit for declaratory and injunctive relief.[73]

## III.    LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."[74] "'A grant of summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[75] "The evidence is viewed 'in the light most favorable to the non-moving party.'"[76]

AOGCC has recognized that CPAI's preemption claim "sets forth a pure question of law."[77] It is thus appropriate for resolution by summary judgment.

## IV.    ARGUMENT

The Supremacy Clause dictates that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any . . .

---

[73] To avoid the need for a preliminary injunction, AOGCC has agreed to hold the Well Data confidential during the pendency of litigation concerning that confidentiality.

[74] Fed. R. Civ. P. 56(a).

[75] *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020) (quoting *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1277 (9th Cir. 2017)).

[76] *Id.* (quoting *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (en banc)).

[77] Dkt. 8-1 at 9.

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                    17

**STOEL RIVES** LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

Laws of any State to the Contrary notwithstanding."[78]  "Preemption is rooted in the

'fundamental principle of the Constitution . . . that Congress has the power to preempt state

law.'"[79]  Congressional purpose is the "ultimate touchstone in every preemption case."[80]

Preemption can arise in several different ways.  Conflict preemption is a type of

implied preemption that arises when state law conflicts with a federal statute.[81]  "Express

preemption arises 'when the text of a federal statute explicitly manifests Congress's intent

to displace state law.'"[82]  Here, AOGCC's application of the State Disclosure Laws to

allow early public disclosure of CPAI's Well Data is preempted under both the conflict

preemption and express preemption doctrines.[83]

### A. AOGCC's Public Disclosure of Well Data Impermissibly Conflicts with Federal Law and Stands as an Obstacle to Congress's Objectives.

"[S]tate law is nullified to the extent that it actually conflicts with federal law."[84]

This includes "those instances where the challenged state law 'stands as an obstacle to the

---

[78] *See* U.S. Const., art. VI, cl. 2.

[79] *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107, 1113 (9th Cir. 2022) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)).

[80] *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

[81] *Bonta*, 22 F.4th at 1113–14.

[82] *Id.* (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022 (9th Cir. 2013)).

[83] This is an "as applied" challenge because AOGCC's proposed application of the State Disclosure Laws in this instance is unconstitutional.  If AOGCC adhered to the federal law confidentiality protections, thus reconciling the two systems, there would be no preemption issue.  *See Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1108 (9th Cir. 2016) (discussing "as applied" versus "facial" preemption challenges).

[84] *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                    18

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

accomplishment and execution of the full purposes and objectives of Congress.'"[85]  The State Disclosure Laws are preempted because they conflict with and stand as an obstacle to Congress's objective to incentivize private oil and gas exploration and development in the NPR-A.

### 1. The State Disclosure Laws obstruct and impermissibly interfere with Congress's goal of incentivizing exploration.

"Obstacle preemption" applies "where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.  What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects[.]"[86]  Congress's purposes and objectives in enacting the NPRPA are clear *and undisputed*:  to permit **and incentivize** the private exploration of the NPR-A.[87]  The "intended effects" of the NPRPA as a whole were to promote private exploration of NPR-A, using various incentives—including confidentiality protections for explorers' data—to motivate private explorers to undertake that effort.  Because AOGCC seeks to use the State Disclosure Laws to remove (or dramatically weaken) these

---

[85] *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

[86] *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (cleaned up).

[87] *See* Motion at 18 ("The structure and purpose of the NPRPA, as amended by Public Law 96-514, show's [sic] Congress's intent to open the NPR-A to *and incentivize private exploration*.") (emphasis added); *see also, e.g.*, 94 Stat. 2964 (directing the creation of "an expeditious program of competitive [private] leasing of oil and gas in the [NPR-A]").

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                    19

**STOEL RIVES** LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

incentives, thereby making that exploration and development less likely, the State laws impermissibly interfere with Congress's goals.

The legislative history and undisputed factual record confirm that the State Disclosure Laws interfere with Congress's goal of incentivizing private exploration and development of NPR-A. As recounted in detail above, the 105(b) Report informed Congress that a failure to protect the confidentiality of proprietary data "could have serious disincentive effects" on the explorers' willingness to perform the desired exploration. Congress was further advised that explorers should receive a "competitive edge" in future lease sales by protecting the confidentiality of that proprietary data during the term of the leases.[88] Congress was keenly focused on how the NPRPA's proposed leasing program might incentivize or disincentivize private exploration, and it opted for statutory provisions that would incentivize that exploration.[89] The "structure and purpose of the [NPRPA] as a whole"[90] demonstrated Congress's desire to incentivize private exploration by giving private companies both the means and the motivation to conduct extensive exploration and

---

[88] *See supra* at 3–5.

[89] *See, e.g.*, Hearing Testimony at 770 (noting that the use of multiple leasing systems in NPR-A "is a disincentive to diligent exploration and development that in the long run is costly to both the lessor and lessee"); *id.* at 801 (noting that, in light of the "extraordinarily expensive" nature of drilling costs in NPR-A, a small lease size "is not going to be a strong incentive"); *id.* at 805 (noting that the existence of a profit-sharing program would "provide a disincentive for us to be exploring"); 126 Cong. Rec. 20539 (1980) (stating that if Congress continued a government drilling program in NPR-A, it would "cause delays and a disincentive to rapid creation of a functioning private enterprise effort").

[90] *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (internal quotation marks and citation omitted).

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG            20

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

drilling in NPR-A to help address the nation's oil crisis. To that end, Congress authorized long leases (10 years) with automatic extensions if oil or gas was produced in paying quantities, large tracts (up to 60,000 acres) for exploration, an expedited lease sale schedule (within 20 months after passage of the 1980 amendment), and confidentiality protections for explorers' data.[91]

Congress's adoption and incorporation of the Oil and Gas Information Program into the NPRPA was clearly designed to incentivize competitive private exploration by protecting the confidentiality of explorers' data. It ensured that the data would be held confidential by the federal government, that the State would likewise comply with confidentiality requirements, that anyone violating those requirements would be severely penalized, and that any state law allowing for public access to any privileged information under the program would be preempted.[92] Further, the transmission of Well Data to the State was to be done in such a way so as not to "damage the competitive position of the lessee."[93] All of these elements help incentivize lessees to explore the NPR-A, confident that their Well Data would be protected. Because the State Disclosure Laws would require premature disclosure of the Well Data, they severely weaken the explorers' incentive to

---

[91] *See* 42 U.S.C. § 6506a(d), (h), (i), (m).
[92] *See id.* § 6506a(m); 43 U.S.C. § 1352(a), (c), (d), (f), (g).
[93] 42 U.S.C. §6506a(m); 43 U.S.C. § 1352(d)(1)(B)(ii); *see also* 42 U.S.C. § 6506a(a) (directing the Secretary to "conduct an expeditious program of competitive leasing of oil and gas").

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG          21

perform this exploration.[94]  The State Disclosure Laws must yield to federal law because they obstruct the accomplishment of Congress's objective to incentivize private exploration of NPR-A.

> **2.**    **The State Disclosure Laws disrupt the careful balance struck by Congress through the Oil and Gas Information Program.**

Consistent with the 105(b) Report's conclusions, Congress's incorporation of the Oil and Gas Information Program into the NPRPA struck a careful balance between giving the government access to sensitive exploration data while still protecting that data from the public, thereby incentivizing private parties to explore the NPR-A and to obtain a competitive edge over their competitors.[95]  As applied by AOGCC, the State Disclosure Laws clearly disrupt Congress's careful balance.  Explorers like CPAI are less likely to explore and develop NPR-A if the State is going to disclose their Well Data prematurely, allowing the explorers' competitors to piggyback on these massive investments.  If AOGCC publicly discloses the Well Data prematurely, then Congress's extensive efforts to protect the confidentiality of that data—and to incentivize private exploration and development of the NPR-A—are wholly undermined.  The State Disclosure Laws are thus preempted.

---

[94] *See supra* at 5, 11, 14–16.

[95] *See Arizona*, 567 U.S. at 406 (applying conflict preemption doctrine where state law "would interfere with the careful balance struck by Congress"); *see also supra* at 3–6.

**STOEL RIVES** LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

STOEL RIVES LLP

510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

Congress incentivized private exploration by creating a balanced approach to information-gathering in NPR-A. Private explorers agreed to make significant investments to explore the NPR-A and share that data with the government and, in exchange, the federal government implemented robust confidentiality protections for that data so that the explorers' competitors could not gain access to it while the explorers' leases were still in force.[96] The government would access the Well Data and better understand this largely unexplored resource, while private explorers' data would be held confidential from the public (and competitors) so the explorers could secure the benefits from that data while their leases were in force. This careful balance was captured in both the NPRPA and the leases themselves.[97]

AOGCC's application of the State Disclosure Laws improperly elevates State law over the NPRPA's Oil and Gas Information Program. State law would dictate when the Well Data would be disclosed, contrary to the NPRPA's careful protections. Obviously, the federal confidentiality protections are meaningless if the State circumvents them through the State Disclosure Laws because any public disclosure destroys the Well Data's enormous value.[98] This premature disclosure also largely eviscerates CPAI's incentive to collect the Well Data in the first place.[99] It makes no sense for Congress to go to such great

---

[96] *See supra* at 8–13.
[97] *See* Schell Decl. Ex. 1; 42 U.S.C. § 6506a(m).
[98] Dkt. 1 at 11 ¶ 33.
[99] *See, e.g.*, *supra* notes 15, 16, and 41 (describing incentives associated with the Oil and Gas Information Program and the need for such incentives in NPR-A). CPAI recognizes

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG              23

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

lengths (or any lengths at all) to protect the confidentiality of the Well Data if the very same data can be freely disclosed at the discretion of the State.

Allowing the State to disclose the Well Data through the State Disclosure Laws would lead to real and significant consequences. First, explorers would be deprived of the "competitive edge" that the 105(b) Report explained was vital for any private leasing program.[100] Second, virtually all of the penalties for a state's improper disclosure of confidential information under the NPRPA would be rendered inoperative, in violation of basic canons of statutory interpretation.[101] The State would always be able to say that it was not disclosing highly confidential data obtained through the Oil and Gas Information Program but instead through its own statutory scheme, and thus would not be subject to any civil action for damages, let alone any prohibition on receipt of that information.[102]

---

that its Well Data may be publicly disclosed later, pursuant to federal law, and CPAI accounted for that ultimate disclosure when it weighed whether to obtain the leases. The State's threatened premature disclosure dramatically alters that calculus and makes explorations in NPR-A less attractive and less likely, thereby undermining the NPRPA's purpose.

[100] *See supra* at 4–5. While explorers would still have this "edge" for roughly two years after a well was drilled, under State law, that minimal period is cold comfort when exploration and production can take more than a decade of effort. *See supra* notes 30, 31. And, more to the point, it conflicts with Congress's determination that explorers' data should be held confidential for the duration of the lease.

[101] *See* 42 U.S.C. § 6506a(m); 43 U.S.C. § 1352(d), (e), (f), (h); *see also United States v. Hansen*, 25 F.4th 1103, 1108 (9th Cir. 2022) ("It is axiomatic that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (internal quotation marks and citation omitted)).

[102] 42 U.S.C. § 6506a(m); 43 U.S.C. § 1352(f)–(h) ("Civil action against United States or State for failure to maintain confidentiality of information.").

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG          24

Third, it would create the very same "significant disincentives" to exploration that Congress sought to avoid. The predictable outcome would thus be less exploration of NPR-A and less development of that federal resource, in direct contravention of the NPRPA's purpose.

Congress decides what confidentiality period is needed to incentivize exploration in the NPR-A. It does not matter what confidentiality protections the State thinks are "reasonable" to achieve Congress's goals;[103] it is Congress's views, as reflected in the NPRPA, that govern. The State cannot dictate to Congress that the confidentiality protections for Well Data expire after two years. The Supremacy Clause requires that inconsistent state laws yield to federal law.

### 3. The State cannot interfere with the federal government's ability to contract.

AOGCC's application of the State Disclosure Laws to require premature disclosure of CPAI's Well Data also impermissibly interferes with the federal government's contracting decisions. This provides another basis for preemption.

The federal government determined, as reflected in both the NPRPA and the leases themselves, that lessees like CPAI must agree to provide their Well Data to the government on the condition that such data would be subject to public disclosure after the leases

---

[103] Dkt. 8-1 at 19 (asserting that the State Disclosure Laws do not interfere with private exploration of the NPR-A because the two-year confidentiality window is "reasonable").

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG        25

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

expire.[104]  Through its improper application of the State Disclosure Laws, AOGCC purports to impose an additional condition on CPAI's federal exploration efforts that was never contemplated by Congress—namely, the condition that the Well Data would be subject to public disclosure just two years after the well was completed.[105]  "A State may not enforce licensing requirements which, though valid in the absence of federal regulation, . . . impose upon the performance of activity sanctioned by federal license additional conditions not contemplated by Congress."[106]  AOGCC's purported requirement renders the longer confidentiality promise in the federal lease and federal law meaningless. "Courts have consistently held that any state law that impedes the federal government's ability to contract—including state licensing regimes that effectively second guess United States' contracting decisions—are preempted."[107]  Allowing AOGCC to circumvent the federal government's confidentiality protections by separately conditioning any State permit on a shorter (and inconsistent) disclosure requirement would undermine Congress's federal program of competitive leasing of oil and gas in the NPR-A.  While CPAI and other explorers will comply with State law while carrying out their exploration and development activities, there is no requirement that they comply with any such inconsistent permit-

---

[104] Schell Decl., Exh. 1; 42 U.S.C. § 6506a(m); *see also Griffin & Griffin Expl., LLC v. United States*, 116 Fed. Cl. 163, 171 (2014) ("A lease, of course, is a contract.").
[105] *See* AS 31.05.035(c).
[106] *Sperry v. Florida ex rel. Florida Bar*, 373 U.S. 379, 385 (1963).
[107] *See Student Loan Servicing All. v. D.C.*, 351 F. Supp. 3d 26, 62–66 (D.D.C. 2018) (collecting and discussing cases where states second guessed the federal government's contracting and licensing decisions and where those state actions were preempted).

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG          26

related laws that are preempted by federal law.[108]  AOGCC's premature disclosure requirement would entirely frustrate the federal government's purpose in including the confidentiality protection as part of its contracting regime for this federal activity.  It impedes the federal government's ability to contract with private explorers like CPAI by adding new, inconsistent conditions that the lessee must satisfy.[109]  AOGCC's attempt to publicly disclose CPAI's Well Data is preempted for this reason as well.

### B. The Confidential Information Statute Expressly Preempts the State's Public Disclosure of CPAI's Well Data.

Express preemption arises when Congress announces its intent to invalidate state law through "an express preemption provision" explicit in the federal statute itself.[110]  When a statute contains an express preemption clause, the court does not invoke any presumption against preemption.[111]

---

[108] *See Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437, 439–41 (9th Cir. 1991).

[109] This is unlike those instances where the federal government sets a mandatory "floor" (e.g., for safety standards) that the State may exceed with its own statute or common law. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 868 (2000).  Instead, Congress established the requisite confidentiality protections that were necessary for its carefully balanced information-gathering program.  Any inconsistent State laws that undermine that program are preempted.

[110] *Arizona*, 567 U.S. at 399.

[111] *See Int'l Bhd. of Teamsters, Loc. 2785 v. Fed. Motor Carrier Safety Admin.*, 986 F.3d 841, 853 (9th Cir. 2021), *cert. denied sub nom. Trescott v. Fed. Motor Carrier Safety Admin.*, 142 S. Ct. 93 (2021).

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                27

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

The federal leases on which CPAI drilled the Wells were issued pursuant to the NPRPA, and the parties agree that the NPRPA contains the following express preemption provision:

> *Any* provision of State or local law which provides for public access to any privileged information *received or obtained by any person* pursuant to this subchapter is expressly preempted by the provisions of this section, to the extent that it applies to such information.[112]

"Where Congress enacts an express preemption provision, [the court's] task is to interpret the provision and 'identify the domain expressly pre-empted by that language.'"[113] The court uses "the text of the provision, the surrounding statutory framework, and Congress's stated purposes in enacting the statute to determine the proper scope of an express preemption provision."[114]

### 1. The statutory framework and text of the NPRPA confirm that the express preemption provision applies to the State Disclosure Laws as applied by AOGCC.

The preemption provision applies broadly to prevent "[a]ny provision of State or local law" from circumventing the Oil and Gas Information Program's confidentiality protection.[115] The provision is contextualized by other subsections of the NPRPA, which

---

[112] 43 U.S.C. § 1352(g) (emphases added); *see also* 42 U.S.C. § 6506a(m) (incorporating same); Dkt. 8-1 at 4–7, 10, 14 (acknowledging that the preemption clause applies to state laws that provide public access to information received or obtained by any person pursuant to the Oil and Gas Information Program).

[113] *Chae v. SLM Corp.*, 593 F.3d 936, 942 (9th Cir. 2010) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996)).

[114] *Id.*

[115] 43 U.S.C. § 1352(g).

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG          28

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

address: the creation of a program of "competitive leasing" of oil and gas in the NPR-A; explorers providing the federal government with access to their exploration data, subject to stringent confidentiality protections; and the transmission of that data to the State— again, subject to these confidentiality protections—so long as it would not "unduly damage the competitive position of the lessee" who collected the data.[116] Congress ensured that this confidentiality protection would have "teeth" by making the State liable for civil damages if a state employee revealed information (*e.g.*, Well Data) in violation of the confidentiality regulations.[117] And after laying out these requirements and protections for explorers' data, Congress added express preemption language to ensure that no state or local law would interfere with its arrangement for obtaining confidential data from private explorers. The statutory framework contemplates that, in furtherance of the NPRPA's competitive oil and gas leasing program, the Well Data would be held strictly confidential and any state law that interfered with that confidentiality (and thus with the competitive program itself) would be preempted.

The Oil and Gas Information Program's implementing regulations reinforce the central importance of protecting a lessee's confidential exploration data because of its impact on the lessee's competitive position. For example, when providing a summary report of the Well Data and other information to the State, the federal government refuses

---

[116] *See* 42 U.S.C. § 6506a(a), (m); 43 U.S.C. § 1352(a), (c), (d)(1)(B)(ii).
[117] *See* 43 U.S.C. § 1352(f).

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                29

to include data or information that "would unduly damage the competitive position of the lessee" that provided that data.[118] Beyond simply withholding certain data, the federal government takes extraordinary efforts to protect the confidentiality of that data. This includes requiring independent contractors who must access the data to "execute a written commitment not to disclose any data or information to anyone" without express consent and to use the data solely for specified purposes.[119] Any unauthorized disclosure of that data would subject the contractor to significant penalties.[120] Further, any data shared with the State is subject to the limitations of the Freedom of Information Act.[121] The Well Data is protected from disclosure under that statute because the data is a trade secret and commercial or financial information obtained from CPAI, and because it comprises geological and geophysical information and data concerning wells.[122] The State is required to maintain the confidentiality of the data and, if it fails to do so, can be subject to significant penalties.[123] These provisions all demonstrate Congress's urgent desire to protect the confidentiality of the Well Data and thereby to incentivize CPAI to explore and develop the NPR-A. These stringent protections would be largely worthless if the State could simply bypass them with a statute requiring premature disclosure of the same Well

---

[118] 30 C.F.R. § 552.4(a).
[119] *Id.* § 552.3(d).
[120] *See id.*
[121] *See id.* §§ 552.5(b), 552.6, 552.7(a)(3).
[122] 5 U.S.C. § 552(b)(4), (9); Schell Decl. at ¶¶ 3, 4, 7.
[123] 30 C.F.R. § 552.7.

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                    30

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

Data. Given this statutory framework, the express preemption provision only makes sense if it protects the Well Data from laws like the State Disclosure Laws that threaten to disrupt Congress's carefully balanced approach. Congress's intent is clear: In order to incentivize private exploration of the NPR-A and to prevent a state from disrupting that set of incentives, Congress protected the confidentiality of the Well Data and preempted the State Disclosure Laws that would require premature public disclosure of that data.

A plain reading of the preemption provision's text leads to the same result. It preempts "[a]ny provision of State or local law which provides for public access to any privileged information received or obtained by any person pursuant to this subchapter . . . ." It is beyond dispute that the State Disclosure Laws provide for public access to privileged information that was obtained through the NPRPA's competitive oil and gas leasing program in the NPR-A. AOGCC contends, however, that the provision does not apply because AOGCC claims it only received the Well Data from its compulsory data collection process under State law, not through the Oil and Gas Information Program.[124] AOGCC is mistaken.

By statute, the Well Data is subject to the conditions of the Oil and Gas Information Program, which includes confidentiality protections and the preemption of inconsistent

---

[124] *See* Dkt. 8-1 at 2, 15, 20.

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG            31

State law.[125]  The preemption provision applies to any State law purporting to allow public access to privileged information "received or obtained by any person" under the Oil and Gas Information Program.[126]  CPAI obtained the Well Data pursuant to the Oil and Gas Information Program.[127]  The State Disclosure Laws are thus facially and expressly preempted insofar as they purport to allow for public access to that Well Data.  The Well Data does not lose its protections simply because the State has requested that CPAI deliver some of that protected data to it under a parallel system.  Even if such a requirement was proper (and it is not),[128] it would not divest the Well Data of its statutory protections that vested when the data was originally obtained under the Oil and Gas Information Program.  AOGCC's subsequent receipt of that Well Data is therefore pursuant to the Oil and Gas Information Program.

Even under AOGCC's narrow interpretation of the NPRPA's preemption provision, AOGCC still received the Well Data through the Oil and Gas Information Program, and the provision therefore preempts the State Disclosure Laws.  CPAI obtained the Well Data from its drilling operations in NPR-A and submitted that Well Data to the Department of

---

[125] 42 U.S.C. § 6506a(m) ("Any information acquired in [private] explorations [of NPR-A] shall be subject to the conditions of 43 U.S.C. 1352(a)(1)(A)."); 43 U.S.C. § 1352(c), (g).

[126] 43 U.S.C. § 1352(g).

[127] Schell Decl. ¶ 3; 42 U.S.C. § 6506a(m); *see also* 43 U.S.C. § 1352(a) (describing "[a]ccess to data and information *obtained by lessee* or permittee from oil or gas exploration" (emphasis added)).

[128] *See supra* section IV.A.3.

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG              32

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

Interior.[129]  In order to allow the federal and state regulatory systems to work harmoniously, CPAI then consented to the delivery of a subset of that data to AOGCC, but this consent included express conditions that were conveyed in writing on the transmittal paperwork.[130]  This included notifying AOGCC that the "Confidential Data . . . is from a well located on federal land (Federal Well Data)," and notifying AOGCC that "[t]his Federal Well Data is exploration well data that . . . must be held confidential indefinitely (i.e., beyond two years) under 5 U.S.C. 552(b)(4) and (9)."[131]  The Well Data CPAI provided to AOGCC was a subset of the Well Data CPAI provided to BLM.[132]  Under the Oil and Gas Information Program, proprietary Well Data may be transmitted to the State if "the lessee who provided the privileged or proprietary data or information agrees in writing to the transmittal of the data or information."[133]  CPAI consented in writing to the transmittal of the Well Data to AOGCC under the express condition "that the Well Data must be held confidential pursuant to federal law."[134]  Accordingly, AOGCC "received or obtained" CPAI's Well Data pursuant to the Oil and Gas Information Program.

The statutory framework of the NPRPA and the preemption provision's text confirm Congress's intent to preempt the State Disclosure Laws.

---

[129] Schell Decl. at ¶ 7.
[130] *Id.*
[131] *Id.*
[132] *Id.*
[133] 30 C.F.R. § 552.7(a)(2)(i).
[134] Schell Decl. at ¶ 7.

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG            33

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

### 2. Congress's purpose further confirms that the State Disclosure Laws are expressly preempted.

Congress's stated purpose in enacting the NPRPA leaves no doubt that Congress intended to preempt the State Disclosure Laws. As detailed above, Congress wanted to incentivize exploration and "an expeditious program of *competitive* leasing of oil and gas in the [NPR-A]."[135] Congress thus created a statutory framework so private oil and gas companies could conduct proprietary exploratory research in the NPR-A that would enable them to competitively bid on leases. Explorers testified that they needed to conduct their own proprietary research to evaluate the acreage.[136] The 105(b) Report recognized that early public release of this confidential data "could have serious disincentive effects," thereby chilling the very exploratory efforts that Congress sought to promote.[137] Accordingly, the Department of Interior informed Congress that the release of such data should occur after the lease expired and the acreage was relinquished to the federal government.[138] This would allow companies "involved in exploration" to "maintain some competitive edge" for upcoming lease sales.[139] Explorers make significant investments of

---

[135] 94 Stat. 2964 (emphasis added).

[136] E.g., Hearing Testimony at 799 ("We would not bid on the basis of the data that we have right now. We would take the data we have now and extensively reprocess it, and we would go in and do additional [seismic] shooting with recording techniques that we feel, in our judgment, is the best to tackle that specific geological problem."); *id.* (noting that another explorer confirmed the existing data was inadequate).

[137] *See supra* note 15 and accompanying text.

[138] *See supra* note 16 and accompanying text.

[139] *Id.*

*ConocoPhillips Alaska, Inc. v. AOGCC*

Case No. 3:22-cv-00121-SLG 34

time and money obtaining confidential proprietary data to inform their competitive bidding approach for lease sales. Because these lease sales were expected to continue for decades,[140] private companies would need to continue using their confidential proprietary data (e.g., the Well Data) for many years.

Congress clearly understood that explorers like CPAI needed to obtain and maintain confidential Well Data to participate in the NPRPA's competitive leasing program, and that any early public release of that proprietary exploratory data would create a serious disincentive for private explorers to make the necessary investments to obtain that data. The success of the NPRPA and its private exploration program was thus predicated on ensuring that explorers' proprietary data would be protected so that they would be incentivized to undertake these investments. Accordingly, Congress sought to protect the confidentiality of the explorers' proprietary data by providing that any information acquired through private explorations in the NPR-A would be treated as though it had been gathered as part of OCSLA's Oil and Gas Information Program.[141] Congress's decision to subject the Well Data to the "conditions" of OCSLA's Oil and Gas Information Program is dispositive here for at least two reasons.

---

[140] *See* 105(b) Report at 60 (assuming that production would continue for 60 years). Indeed, there was a lease sale held on January 6, 2021, and more lease sales are anticipated in the future.

[141] 42 U.S.C. § 6506a(m) ("Any information acquired in such explorations shall be subject to the conditions of 43 U.S.C. 1352(a)(1)(A)").

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG          35

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

First, the Oil and Gas Information Program's preemption clause expressly prevents states and localities from using their own statutes or ordinances to circumvent the program's confidentiality protections.  That is its entire purpose.  Just as a state cannot enact its own law requiring disclosure of this information, nor can it use a state law to require separate delivery of the same information to the state and then rely on a state-created apparatus as a mechanism for disclosing the very same information.[142]  The State cannot manufacture an exception to the preemption clause by conditioning a permit on CPAI's separate delivery of the same Well Data to the State, and then insisting that public disclosure is permitted under separate State law.

Second, by requiring that the Well Data be subject to the "conditions" of the OCSLA's Oil and Gas Information Program, Congress sought to ensure that the Well Data would be treated in the same way as other proprietary and confidential data under OCSLA.  One of the conditions of OCSLA, which includes the Oil and Gas Information Program, is that states cannot enact laws that are inconsistent with OCSLA.[143]  As the Supreme Court recently explained, "state laws can be 'applicable and not inconsistent' with federal law under [43 U.S.C.] § 1333(a)(2)(A) only if federal law does not address the relevant issue."[144]  Because federal law (i.e., the Oil and Gas Information Program) addresses the

---

[142] *See, e.g.*, *City of Eugene, Ore. v. FCC*, 998 F.3d 701, 710–11 (6th Cir. 2021) (finding that states may not circumvent a federal statute's limitations by using other governmental entities to accomplish indirectly what they are prohibited from doing directly).
[143] *See* 43 U.S.C. § 1333(a)(2)(A).
[144] *Parker Drilling Mgmt. Servs. v. Newton*, 139 S. Ct. 1881, 1889 (2019).

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG                    36

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

issue of CPAI's obligation to gather and share the Well Data confidentially with the government, the State Disclosure Laws do not apply.[145]

By incorporating OCSLA's Oil and Gas Information Program's "conditions" as the applicable standard for how Well Data would be handled, Congress determined that OCSLA's requirements would apply here (and that inconsistent state laws addressing the relevant issue would not apply). In *Taylor Energy Company, LLC v. United States*, a company ("Taylor") entered into a contract with the Department of Interior's Minerals Management Service to provide financial security for well remediation issues.[146] The contract "incorporates OCSLA decommissioning regulations in two areas," but also contained a choice of law provision stating that the contract would be governed by Louisiana state law.[147] Following a dispute regarding whether Taylor had satisfied its obligations to decommission the wells properly, Taylor filed suit against the agency for breach of contract under state law.[148] The Federal Circuit Court of Appeals affirmed the dismissal of Taylor's complaint because all of the issues underlying Taylor's state law claims were addressed by OCSLA regulations that had been incorporated into the contract.[149] "The [contract's] repeated references to the OCSLA regulations erase any

---

[145] *See id.* at 1889, 1893; *see also, e.g.*, *Mauia v. Petrochem Insulation, Inc.*, 5 F.4th 1068, 1072–75 (9th Cir. 2021).
[146] 975 F.3d 1303, 1308 (Fed. Cir. 2020).
[147] *Id.*
[148] *See id.* at 1311.
[149] *See id.* at 1314, 1317.

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG          37

doubt that federal law governs the issues underlying the agreement."[150]  Congress's choice

to incorporate the Oil and Gas Information Program as part of the NPRPA renders the State

Disclosure Laws inapplicable to the Well Data.

In sum, Congress's purpose in enacting the express preemption provision aligns

with the provision's text and structure, which all confirm that AOGCC's application of the

State Disclosure Laws to publicly disclose CPAI's Well Data is expressly preempted.

## V.    CONCLUSION

For the reasons explained above, this court should rule that AOGCC's decision to

publicly release CPAI's Well Data is preempted by federal law.


I certify that this brief contains 9,951 words, in compliance with Local Civil Rule

7.4(a).

DATED:  July 29, 2022                    STOEL RIVES LLP


By:/s/ Kevin M. Cuddy
    Kevin M. Cuddy (Bar No. 0810062)
    Connor R. Smith (Bar No. 1905046)

---

[150] *Id.* at 1315.  The contract at issue did not expressly incorporate the entirety of OCSLA, but the court concluded that 43 U.S.C. § 1333(a)(2)(A) nevertheless applied where certain OCSLA regulations had been incorporated into the contract.  *See id.* at 1308, 1313–14.

*ConocoPhillips Alaska, Inc. v. AOGCC*
Case No. 3:22-cv-00121-SLG          38

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

**CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2022, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court, District of Alaska, by using the CM/ECF system. Participants in this Case No. 3:22-cv-00121-SLG, who are registered CM/ECF users, will be served by the CM/ECF system.

Mary Hunter Gramling
Zjok T. Durst
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
mary.gramling@alaska.gov
zjok.durst@alaska.gov

*Attorneys for Defendant AOGCC*

/s/ Kevin M. Cuddy
Kevin M. Cuddy